# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| JONATHAN ASHLEY AGEE, ) | |
|     Plaintiff, ) | Civil Action No. 7:17cv00537 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| JEFF KISER, *et al.*, ) | By: Norman K. Moon |
|     Defendants. ) | Senior United States District Judge |

Plaintiff Jonathan Ashley Agee, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that several defendant prison officials violated his federal constitutional rights. (Dkt. 1). The matter is before the court on Defendants' motion for summary judgment (dkt. 38), and Plaintiff's motion for preliminary injunction (dkt. 43). For the reasons that follow, I will grant Defendants' motion and deny Plaintiff's motion.

## I.    Legal Standards

### A.    Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The dispute over a material fact must be genuine, "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). As such, the moving party is entitled to summary judgment if the evidence supporting a genuine issue of material fact "is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 250.

"The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," *Appalachian Power Co. v. Arthur*, 39 F. Supp. 3d 790, 796 (W.D. Va.

2014), by "pointing out to the district court . . . an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party makes that showing, the nonmoving party must then set forth specific, admissible facts in evidence to demonstrate a genuine dispute of fact for trial. *See* Fed. R. Civ. P. 56(c), (e); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In considering a motion for summary judgment, the court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party.[1] *Celotex*, 477 U.S. at 322–24; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). The evidence set forth must meet the "substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993).

### B. Motion for Preliminary Injunction

Preliminary injunctive relief is an extraordinary remedy that courts should apply sparingly. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991). As a preliminary injunction temporarily affords an extraordinary remedy prior to trial that can be granted permanently after trial, the party seeking a preliminary injunction must demonstrate: (1)

---

[1] Agee is proceeding *pro se*, and therefore is also entitled to a liberal construction of the pleading. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 90–95 (2007). However, "principles requiring generous construction of *pro se* complaints are not . . . without limits." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). The Fourth Circuit has explained that "though *pro se* litigants cannot . . . be expected to frame legal issues with the clarity and precision ideally evident in the work of those trained in law, neither can district courts be required to conjure up and decide issues never fairly presented to them." *Id.* at 1276. "Applying these principles to the summary judgment context, a *pro se* plaintiff must comply with Rule 56 of the Federal Rules of Civil Procedure and come forward with sufficient evidence upon which a reasonable jury could return a verdict in his or her favor." *Reid v. Charlotte-Mecklenburg Bd. of Educ.*, No. 3:14cv66, 2016 WL 6080545, at *4 (W.D.N.C. Feb. 12, 2016).

by a "clear showing," that he is likely to succeed on the merits at trial; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20-22 (2008).

## II. Background

Agee is a former deputy sheriff. (Dkt. 1, at 4). In 2013, he was convicted of first-degree murder and sentenced to a term of life imprisonment within the Virginia Department of Corrections ("VDOC"). (*See id.*; Sentencing Order, *Commonwealth v. Agee*, No. CR11-1171, at 1-3 (Va. Cir. Ct. May 8, 2013), dkt. 39-5). Given his "long" history of arresting now-incarcerated individuals, some of whom "are known gang members," Agee was placed in "protective custody status" when he entered prison.[2] (Dkt. 1, at 4; *see also* Pl.'s Statement of Facts, dkt. 1-1, at 1; Ex. 1, dkt. 1-2, at 1; Swiney Aff. 1-2, dkt. 39-3). He now resides at Red Onion State Prison ("ROSP") in Pound, Virginia. (*See* dkts. 1, 45). This lawsuit stems from ROSP officials' decision to remove Agee from protective custody and to place him in long-term segregation in September 2016, as well their recommendation in November 2017 that he be transferred to a prison outside of Virginia. (*See* dkt. 1, at 3–7). Both decisions followed Agee's disciplinary conviction for assaulting another inmate while he was still under protective custody. (*See id.* at 4–5).

---

[2] Agee repeatedly alleges that the sentencing judge "ordered" that he be placed in protective custody because of his background in law enforcement, and that, as a result, his removal from protective custody and possible interstate transfer violate the state court's "sentencing order" in his criminal case. (*See, e.g.*, dkt. 1, at 3–4, dkt. 1-1, at 2; dkt. 41, at 7). Defendants have submitted a copy of the Sentencing Order in *Commonwealth v. Jonathan Ashley Agee*, showing Agee was convicted of first-degree murder and sentenced to incarceration in the Virginia Department of Corrections "for life," which "shall run consecutive to all other sentences." (*See* dkt. 39-5, at 2–3). The order says nothing about Agee's housing assignment or conditions of confinement, (*id.* at 1–3), and Agee has not produced any evidence supporting his assertions that the state sentencing court "ordered" that he be permanently housed under protective custody.

3

On September 10, 2016, Agee was in the D-1 pod with several other inmates during recreation. (*See* dkt. 1-1, at 1; Offense Report, at 1-2 (Sept. 10, 2016), dkt. 39-1; Fannin Aff. 4, dkt. 39-2). Around 10:00 a.m., an officer received notice of a "possible" inmate-on-inmate assault. (Dkt. 39-1, at 4). The officer reviewed footage from the pod's rapid eye camera system, which, according to the officer's written report, showed Agee approach inmate Thomas Childers "from behind . . . and place[] him in a chokehold pushing him back down" in his chair while four other inmates "assaulted him." (*Id.*). Childers "positively identifie[d] each of his attackers, including Agee in this assault." (*Id.*). The officer promptly filed a Disciplinary Offense Report charging Agee with "Offense 105B – Aggravated Assault Upon an Offender"[3] based on Childers's statements and the conduct that the officer observed on the surveillance video. (*Id.*). A different officer delivered a copy of the Disciplinary Offense Report, along with a written "Penalty Offer" proposing loss of telephone privileges for thirty days, to Agee around four o'clock that afternoon. (*Id.* at 4, 7). Agee accepted the penalty offer right away. (*Id.* at 7). His signature on these documents indicates his understanding that, by accepting the penalty offer, he was "pleading guilty to the offense" as charged in the disciplinarily report; giving up his rights to a formal disciplinary hearing, to call witnesses and present evidence in his defense, and to question any person who made a statement against him; agreeing to the thirty-day suspension of his telephone privileges; and permanently foreclosing "any appeal of this offense," except on limited procedural grounds. (*Id.* at 4, 7). Defendant Walter Swiney, the Unit Manager of the D Unit at ROSP, approved Agee's plea of guilty on September 14, 2016. (*Id.* at 6; dkt. 39-3, at 1–2). Agee did not appeal this disposition. (Counts Aff. 2, dkt. 39-1).

---

[3] "Aggravated Assault" means "[i]ntentional, impermissible physical contact by one person upon another . . . involving a weapon and/or resulting in serious injury or committed with the intent to inflict serious injury." (Definitions, Sec. III, VDOC Operating Procedure ("O.P."), dkt. 39-1, at 8). "In the case of an altercation between two offenders, this offense will apply only to the offender who attacks or initiates the actual physical contact" against the other person. (*Id.* at 13).

Around the same time, Agee was removed from protective custody and placed in administrative segregation. (*See* dkt. 1, at 3–4; dkt. 39-3, at 2). On September 12, Defendant Carroll Stanley, acting as the Institutional Classification Authority ("ICA"), held a hearing to review Agee's housing status in light of his recent disciplinary charge. (Dkt. 39-3, at 3). Stanley recommended Agee's status be changed to "segregation administration" because he "accepted the penalty offer" on the aggravated assault charge. (*Id.* at 5 ("Offender Statement: Took the penalty offer.")). Defendant Swiney approved this recommendation the next day. (*Id.* at 2, 5).

On September 16, Swiney held an ICA Hearing to review Agee's security-level designation. (Dkt. 39-3, at 6; *see also* dkt. 1, at 3–4). He recommended that Agee "see a change in [his] security from level 'P,'" or "Protective Custody," to "security level 'S,'" or "Segregation," based on his involvement in the September 10 attack on Childers, subsequent disciplinary charge, and the fact that Childers "suffered serious injuries to his hand and abdomen causing ongoing off site medical treatment." (Dkt. 39-3, at 6 (internal quotation marks added)). The ICA report also indicates that Agee would "benefit[] from the programs and security in a security level S setting." (*Id.*). Agee was moved to a long-term segregation unit on September 19, 2016 (*See id.* at 3, 5). He did not appeal this determination within the time allowed under VDOC's standard grievance process.

On November 7, 2017, Agee attended a third ICA hearing, this time to determine whether he should be recommended for Interstate Corrections Compact Transfer. (*See* dkt. 39-3, at 3, 7). Agee objected that he did not "want to be sent out of state" and he could go to other VDOC facilities. (*Id.* at 7). The ICA hearing report states that Agee was "originally in protective custody until he received [the] 105B charge," and that he "made progress" at security level "S." (*Id.*). It recommended that he be transferred to a prison outside Virginia so he could be even "more successful and . . . productive" while serving his life sentence. (*Id.*). The report lists Defendant

Gary Adams as the ICA who made this recommendation. (*Id.*). Agee alleges that it was actually Defendant Stanley who "chaired [the] ICA hearing and recommended an out of state transfer." (Dkt. 1-1, at 2, 5). Defendants Stallard and Gilliam, both ROSP counselors, also "participated" in some capacity. (Dkt. 6, at 1). Defendant Larry Collins approved the ICA's recommendation at the administrative level, adding that Agee was housed "in protective custody until he was involved in [a] 5 on 1 assault [against] another offender" in September 2016 and that his "release into general population" at another VDOC facility was "not advised." (*See* dkt. 39-3, at 3, 7). Defendant Collins was a "Unit Manager" when he approved this recommendation. (*Id.* at 3). Agee asserts that Defendant Collins was not authorized to do this because VDOC policy gives the "Facility Unit Head," *i.e.*, the warden or superintendent, exclusive and nondelegable authority to approve interstate transfer recommendations at the facility level. (*See* dkt. 1, at 5–6; dkt. 1-1, at 2; dkt. 1-2, at 3; dkt. 1-3, at 1). Defendant Jeff Kiser was ROSP's warden in November 2017. (*See* dkt. 1, at 2, 6; 39-4, at 22).

On November 27, Agee submitted a Regular Grievance appealing the transfer recommendation. (Dkt. 39-4, at 19). He argued that Defendant Collins did not have authority to approve this recommendation because he was not ROSP's Facility Unit Head. Agee also argued that the initial recommendation was procedurally defective because Defendant Adams was not at the ICA hearing, even though he was listed as the ICA on the hearing report. (*Id.*). Rather, Defendant Stanley "chaired th[e] hearing" and recommended that Agee be transferred out of state "based on the [assault] incident" in September 2016. (*Id.*). Agee also asserted, apparently for the first time, that the surveillance "video [did] not support" a conclusion that "5 people assaulted 1 inmate." (*Id.* ("The rational[e] used is fabricated because it shows 5 people assaulted 1 inmate. Video does not support this.")).

6

Agee filed this lawsuit two days later. (*See* dkt. 1-5, at 1). In his verified complaint, he explained that he had "initiated th[e] exhaustion process," but he decided to file suit because was "being told the [grievance] appeal is only a formality," (dkt. 1, at 2–3), and would not stop officials from transferring him outside Virginia "to an unknown destination at an unknown facility" where he might be placed in "general population where [his] life will be in imminent danger," (dkt. 1-2, at 2, 5).

On December 13, 2017, Defendant J. Artrip, then ROSP's Assistant Warden, signed a "Level I" response to Agee's grievance. (Dkt. 39-4, at 4, 22; *see also* dkt. 6, at 1–2). The response, drafted by Defendant J. Messer, ROSP's Grievance Coordinator, explained that involuntary interstate transfers "are a mechanism . . . . for offenders [who] may be at risk or pose a serious risk in one correctional system to be moved to another system where the risk may be reduced," and that VDOC's Central Classification Service ("CCS") has "the final authority" to decide whether an inmate is transferred. (Dkt. 39-4, at 22). The facility's recommendation that Agee be transferred out of state was still pending before the CCS at that time. Assistant Warden Artrip also found that Agee's procedural complaints about the facility-level recommendation were "unfounded" because all operating "procedures [were] correctly applied" in his case. (*Id.* ("There has been no violation of operating procedure.")). Agee "exhausted his administrative remedies on this issue" on January 11, 2018, when the Level I response was affirmed by "the Regional Office" on Level II appeal. (Messer Aff. 4, dkt. 39-4). Agee was still housed at ROSP as of January 16, 2019. (*See* dkt. 45, at 1–5).

### III. Claims and Relief Sought

Agee filed this lawsuit alleging that Defendants violated his rights under the Eighth and Fourteenth Amendments. As amended, his Complaint contains five counts against nine named defendants in their official and individual capacities. (Dkt. 1, at 2 ¶¶ 4–5; dkt. 6, at 1; dkt. 10, at

7

1–2). First, Agee contends that Defendant Swiney "initiated proceedings" to move him from protective custody to "a general population segregation unit where gang members have acted out towards" him. (Dkt. 1, at 3–4 ¶ 10). "[O]n at least 3 separate occasions," unidentified ROSP staff members took Agee out of his cell while "fully restrained . . . and put him around unrestrained gang members who threatened [his] life while cutting his hair." (*Id.*).

Second, Agee contends that Defendant Stanley violated his due-process rights because he "chaired [the] ICA hearing and recommended an out of state transfer" without allowing Agee to submit a written statement or providing a "truthful rational[e] to support such a proceeding." (Dkt. 1, at 4–5 ¶ 11). Defendants Stallard and Gilliam "participated in th[is] process" as well. (Dkt. 6, at 1). Agee further alleges that ROSP officials' purported rationale for recommending interstate transfer—i.e., that Agee and four "other inmates assaulted another inmate for no reason" on September 10, 2016—was "false" or "fabricated" because the surveillance footage "of this incident shows a different fact." (Dkt. 1-1, at 1). He asserts that the video shows that Childers was "acting erratically," so Agee

> employed a restraining hold on [him] and released it after [he] sat down and became calm. Video shows Childers jump us, start pointing fingers into another inmate's face, that inmate grabbed Childers's fingers to prevent harm to himself and Childers's finger detained [sic] injury. No other inmates are seen on video assaulting Childers as officials falsely documented.

(*Id.*). Agee admits that he accepted the "penalty offer" for aggravated assault as charged in the Disciplinary Offense Report. (*See* dkt. 41, at 4).

Third, Agee contends that Defendants Adams and Collins violated his due-process rights by endorsing the ICA Hearing form and transfer recommendation without proper authority. (Dkt. 1, at 5 ¶ 12). He asserts that Defendant Adams "falsified" this official document by "sign[ing] the ICA as chairman" even though he did not attend that hearing, and that VDOC policy did not authorize Defendant Collins to endorse the ICA's interstate-transfer recommendation because he

was not the "Facility Unit Head." (*Id.*; *see also* dkt. 1-1, at 2). Fourth, Agee contends that Defendant Kiser violated Agee's due-process rights because he knew "or should have known that [VDOC] policy for interstate transfers" gives him exclusive, nondelegable authority to approve the ICA's recommendation that an inmate be involuntarily transferred out of state. (Dkt. 1, at 6 ¶ 13; *see also* dkt. 1-3, at 1). Finally, Agee contends that Defendants Messer and Artrip "violated [his] rights to due process secured under [VDOC's] Interstate Compact & Transfer policy" because neither facility-level official had authority to answer his Regular Grievance challenging the ICA's recommendation. (Dkt. 10, at 1–2).

Agee seeks compensatory and punitive damages against each Defendant in his or her official and individual capacities, declaratory relief, and an injunction ordering Defendants and VDOC to not transfer Agee "out of the state [or] to any other location unless it is to the protective custody unit at either location at Red Onion or Dillwyn Correctional Center" in central Virginia. (Dkt. 1, at 8 ¶¶ 17–20; *see* dkt. 6, at 1). Defendants collectively moved for summary judgment on the merits of each claim, as well as on their affirmative defense that the action is barred under the Prison Litigation Reform Act ("PLRA") because Agee filed suit in federal court a few weeks before he exhausted his administrative remedies. (Dkt. 39, at 12–22).

## IV. Analysis

### A. PLRA Exhaustion

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). A prisoner must exhaust all available administrative remedies, whether or not they meet federal standards or are plain,

9

speedy, or effective, *Porter v. Nussle*, 534 U.S. 516, 524 (2002), and even if exhaustion would be futile because those remedies would not provide the relief the inmate seeks, *Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2005). There is, however, a "built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" *Blake v. Ross*, 136 S. Ct. 1850, 1855 (2016). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).[4]

Defendants submitted an affidavit establishing that Agee filed this lawsuit in late 2017, after he submitted his regular grievance, but about five weeks before he fully "exhausted his administrative remedies" on January 11, 2018. (*See* dkt. 39-4, at 4). Agee admits as much in his verified complaint. (Dkt. 1, at 2–3). However, Agee disputes whether the officials who handled Agee's grievance could "provide any relief to aggrieved inmates," *Blake*, 136 S. Ct. at 1859, trying to challenge an IAC's recommendation that he be involuntarily transferred out of state. (*See* dkt. 1, at 2–3). According to Defendant Messer's affidavit and supporting exhibit, the officials who responded to Agee's grievance at Level I and Level II essentially said they could not do anything to help him—"the final decision was pending with the CCS," which had "final authority" to approve or deny ROSP's transfer recommendation. (Dkt. 39-4, at 4, 22). After

---

[4] The Supreme Court recently identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross*, 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* (citing *Booth*, 532 U.S. at 736–38). "'[S]ome redress for a wrong is presupposed by the statute's requirement' of an 'available' remedy; 'where the relevant administrative procedure lacks authority to provide any relief,' the inmate has "nothing to exhaust."'" *Id.* (quoting *Booth*, 532 U.S. at 736 & n.4). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

review of VDOC Operating Procedure and viewing the evidence in Agee's favor, the mechanism for review of the transfer recommendation is not entirely clear and the issue remains relatively unbriefed.[5] Therefore, in the interests of justice and judicial expediency, I will analyze the merits of Agee's claims.

### B. Constitutional Claims

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). While the allegations or evidence necessary to proceed with a claim under § 1983 "will vary with the constitutional provision at issue," a plaintiff must at least establish "that each Government-official defendant, through the official's own actions [or omissions], has violated the Constitution" or other federally protected right. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Negligent deprivations are not actionable under § 1983. *See, e.g.*, *Daniels v. Williams*, 474 U.S. 327, 330 (1986); *Pink v. Lester*, 52 F.3d 73, 77 (4th Cir. 1995).

Agee does not sufficiently allege that Defendants Kiser, Artrip, Messer, Gillum, or Stallard were personally involved in any of the events giving rise to his § 1983 claims. First, regardless of whether VDOC policy authorized Defendants Artrip and Messer to handle Agee's grievance challenging the IAC's interstate-transfer recommendation, the mere fact that they drafted and signed the Level I response does not establish the "type of personal involvement required," *Marby v. Ramirez*, No. 2:06cv103, 2007 WL 4190398, at *6 (N.D. W. Va. Nov. 21, 2007), to state a claim for relief under § 1983. *See, e.g.*, *Delk v. Moran*, No. 7:16cv554, 2018

---

[5] The Level I response to Agee's grievance states that "Interstate Compact Procedures and OP 830.1 (Institution Classification Management) governs this issue." (Dkt. 39-4, at 22). The Court takes judicial notice of these policies' content, available at https://vadoc.virginia.gov/about/procedures/default.shtm. *See Crayton v. Kiser*, No. 7:12cv279, 2012 WL 2529189, at *1 n.1 (W.D. Va. June 29, 2012) (citing Fed. R. Evid. 201(b)(2)).

WL 1513296, at *6 (W.D. Va. Mar. 27, 2018); *Crawley v. Parsons*, No. 7:15cv647, 2017 WL 1013120, at *5 n.6 (W.D. Va. Mar. 17, 2017); *Brown v. Va. Dep't of Corrs.*, No. 6:07cv33, 2009 WL 87459, at *13 (Jan. 9, 2009).

Similarly, Agee's assertion that Defendant Kiser "kn[ew] or should have known that [VDOC] policy for interstate transfer" supposedly "require[s] his and only his signature of approval" when the ICA recommends interstate transfer generally, (Dkt. 1, at ¶ 13), is insufficient. It does not support a reasonable inference that Warden Kiser knew about, let alone was personally involved in, the ICA's recommendation *in this case* that Agee be transferred out of state. *See Eastman v. Warden, Balt. City Det. Ctr.*, No. CCB-10-2389, 2011 WL 210343, at *2 (D. Md. Jan. 21, 2011). Finally, Agee does not allege any facts describing *how* Defendants Counselor Stallard and Counselor Gillum were "involved" or "participated in th[e] process" leading to the IAC's recommendation that Agee be transferred to another state. (Dkt. 6, at 1). Absent "further factual enhancement," his "naked assertion" that an unidentified counselor attended the November 7 hearing, (Dkt. 1-4, at 4), is not enough to hold either Defendant personally liable for the misconduct alleged. *See Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

These Defendants have carried their initial burden under Rule 56(c) by showing that the well-pled allegations in Agee's verified complaint, accepted as true and viewed in his favor, do not establish a genuine dispute of material fact over whether any of them were "personally involved" in the underlying constitutional violations. This shifts the burden to Agee to set out facts admissible in evidence to establish a specific material fact genuinely in dispute. *See Celotex*, 477 U.S. at 325. Agee, however, merely responds that he "has in fact stated claims" upon which relief can be granted and "has shown direct [i]nvolvement of all Defendants in his claims and exhibits." (Dkt. 41, at 3). Such conclusory, unsupported allegations do not create a

genuine issue for trial on these claims. Accordingly, Defendants Kiser, Artrip, Messer, Gillum, and Stallard are entitled to judgment as a matter of law in their favor. Fed. R. Civ. P. 56(a).

### 1. Eighth Amendment – Failure to Protect

Agee contends that in September 2016 Defendant Swiney "initiated proceedings" to move Agee from protective custody to "a general population segregation unit where gang members have acted out towards" him. (Dkt. 1, at 3–4 ¶ 10). "In doing so," Swiney allegedly "has placed [Agee's] safety in danger to the point that on at least 3 separate occasions," unidentified ROSP staff members took Agee out of his cell while "fully restrained . . . and put him around unrestrained gang members who threatened [his] life while cutting his hair." (*Id.*).

The Eighth Amendment requires that prison officials "take reasonable measures to guarantee the safety of the inmates," including protecting them "from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). Prison officials violate this duty when the plaintiff-prisoner suffers "physical harm at the hands of fellow inmates [that] results from the deliberate or callous indifference of prison officials to specific known risks of such harm." *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). To prevail on a failure to protect claim, the plaintiff must ultimately prove: (1) that the alleged deprivation was objectively, sufficiently serious; and (2) the defendant-prison official acted or failed to act with a "sufficiently culpable state of mind." *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003); *see also Farmer*, 511 U.S. at 834.

"Only extreme deprivations are adequate to satisfy" the first prong. *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). To demonstrate an extreme deprivation, the inmate must allege "a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." *Odom*, 349 F.3d at 770. For the second prong, a prison

official is liable if the official was deliberately indifferent to the inmate's health or safety. *Farmer*, 511 U.S. at 834. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). An official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Officials cannot be held liable when they merely "should have" recognized the substantial risk of harm; "they actually must have perceived the risk." *Parrish v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004).

Here, Agee does not allege that Defendant Swiney knew about the ROSP inmates "act[ing] out" or threatening Agee's life after he moved to administrative segregation in September 2016. Thus, the only issue is whether a reasonable jury viewing the record in Agee's favor could conclude that Swiney's involvement in changing Agee's housing classification, which in turn played some role in the ICA's recommendation that Agee be transferred out of state, violated Agee's Eighth Amendment rights.

Defendant Swiney submitted an affidavit in which he explains that Agee was removed from "protective custody [at ROSP] because he could no longer be housed and managed in D-1 after he assaulted another offender in that pod." (Dkt. 39-3, at 1–2). Administrative segregation is a more "secure" and "restrictive" housing environment than protective custody. (*Id.* at 2). Agee "made progress [at] security level 'S'" and was recommended for out-of-state transfer in part because his "release into general population" at an VDOC facility was "not advised." (*Id.* at 3). There is one other protective-custody unit within the VDOC system, but Agee's "high[] security level precludes him from assignment" to that facility. (*Id.* at 3–4). Thus, Swiney attests that the ICA recommended interstate transfer "so that [Agee's] status as a former law

14

enforcement officer, as well as his status as an assaultive offender, [could] be properly and safely managed." (*Id.*).

Defendant asserts there is no genuine issue of material fact on this claim because Agee's alleged fears that out-of-state inmates will hurt him if they learn about his background, or that being away from his family in Virginia will make prison unbearable, are too speculative to satisfy the Eighth Amendment's objective element. (Dkt. 39, at 18–19 & n.4; *see* dkt. 1, at 5 (Agee alleging that "such a transfer out of state will place me at an *unknown* destination[,] at an *unknown* facility where that state will process me *possibly* into a general population where [my] life will be in imminent danger") (emphasis added); *see also McLean v. Ray*, No. 7:07cv409, 2007 WL 2472378, at *1 n.2 (W.D. Va. Aug. 30, 2007) ("None of McLean's conclusory allegations show that his safety was in danger at any point. . . . McLean's speculative fear is insufficient to show that he is imminent harm of serious physical injury.")).

Agee does not respond to this assertion. Instead, he shifts the focus of his Eighth Amendment claim away from the physical harm he *might* suffer if transferred to an unknown out-of-state prison, and on to the "lost visitation," restricted phone privileges, "limited time out of his cell," and lack of work opportunities he allegedly experienced while housed in administrative segregation. (Dkt. 42, at 2–3). But, Agee has not pointed to any specific facts admissible in evidence—i.e., something more than unsupported allegations made in his unsworn legal brief—to back up these conclusory statements. *See Ferris v. Accuscribe Transcription Servs.*, No. 2:07-3281, 2010 WL 360689, at *5 n.11 (D.S.C. Jan. 26, 2010) (assertions made in legal briefs are not evidence). Additionally, although Agee takes issue with Swiney's sworn assertion that Agee is not *currently* eligible to be transferred to the lower security protective-custody unit within the VDOC, that factual dispute is not material to whether Swiney can be held

liable for "initiat[ing] proceedings" *in September 2016* that resulted in Agee being moved from ROSP's protective custody unit to the prison's administrative segregation unit.

Accordingly, Defendant Swiney is entitled to judgment as a matter of law in his favor. Fed. R. Civ. P. 56(a).

### 2. Procedural Due Process

To prevail on any of his procedural due-process claims, Agee "must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). Defendants argue that Agee has not identified a protected liberty interest in his possible interstate transfer because, like all convicted prisoners, Agee "has 'no justifiable expectation that he will be incarcerated in any particular state.'" (Dkt. 39, at 12 (quoting *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983)). Agee argues that the VDOC policies governing involuntary interstate transfers create a constitutionally protected "liberty interest" in having prison officials follow certain procedures before they recommend an inmate be transferred out of Virginia. For example, he contends that Defendant Adams "falsified" the ICA Hearing Report by "sign[ing] . . . as chairman" even though he did not attend the hearing, and that VDOC policy did not authorize Defendant Collins to endorse the ICA's recommendation because he was not the "Facility Unit Head." (*See* dkt. 1-1, at 2). He also contends that Defendant Stanley "chaired [the] ICA hearing and recommended an out of state transfer" without allowing Agee to submit a written statement or providing a "truthful rational[e] to support such a proceeding," which Agee believes were required under VDOC policy. (Dkt. 1, at 4–5 ¶ 11). Thus, Agee asserts that Defendants' alleged failure to follow these internal policies and procedures, without more, amounts to a federal constitutional violation.

Process, however, "is not an end to itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim*, 461 U.S.

at 250 (concluding that the lower court "erred in attributing significance to the fact that the prison regulations require a particular kind of hearing before the administrator can exercise his unfettered discretion" to transfer the prisoner to another state). Thus, "even if clearly mandated by state law" or agency policy, procedural protections alone "do not create a liberty interest in either the procedures themselves or the substantive result they purportedly protect." *Holmes v. Cooper*, 872 F. Supp. 298, 302 (W.D. Va. 1995); *see, e.g.*, *Bilal v. Johnson*, No. 7:09cv322, 2009 WL 2753194, at *2 (W.D. Va. Aug. 2009) ("Even though plaintiff alleges that Bass violated VDOC procedures by instituting plaintiff's transfer, a claim that prison officials have not followed their own policies or procedures also does not amount to a constitutional violation." (citing *United States v. Caceres*, 440 U.S. 741 (1979); *Riccio v. Cty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990))).

"[T]o demonstrate a liberty interest meriting procedural due process protection, a prisoner must show (1) denial of 'an interest that can arise either from the Constitution itself or from state laws or policies,' and that (2) this denial imposed on him an 'atypical and significant hardship . . . . in relation to the ordinary incidents of prison life.'" *Prieto*, 780 F.3d at 251 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The federal Constitution does not create "any liberty interest" against interstate prison transfer because "[c]onfinement in another State . . . is within the normal limits or range of custody with the [criminal] conviction has authorized the State to impose." *Olim*, 461 U.S. at 247 (internal quotation marks omitted). Indeed, "it is neither unreasonable nor unusual for an inmate to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced, or to be transferred to an out-of-state prison after serving a portion of his sentence in his home State." *Id.* Thus, Agee "would need to point to a Virginia law or policy providing him with an expectation of avoiding the [challenged] conditions of his confinement," i.e., the Defendant ROSP officials' mere *recommendation* that

17

CCS officials *consider* Agee for Interstate Corrections Compact Transfer, "and demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life." *Id.*

Defendants Adams, Collins, and Stanley assert that Agee cannot carry his burden on the first element because Virginia statutory law gives VDOC's Director and the other prison officials to whom he has delegated his authority, "unfettered discretion in determining when, whether, and how to best manage [Virginia's] offender population via the use of the Compact to transfer offenders out of state." (Dkt. 39, at 15–16 (citing Va. Code § 53.1-217)). Federal courts in Virginia have similarly held that the Commonwealth's "prison transfer regulations do not create any liberty interest in a specific housing assignment, as prison officials have broad discretion under the regulations to determine the facility at which an inmate is housed." *Wilson v. Johnson*, No. 1:09cv334, 2009 WL 2707602, at *7 (E.D. Va. Aug. 25, 2009), *aff'd in relevant part*, 385 F. App'x 319 (2010); *see also Williams v. Bass*, No. 7:07cv319, 2007 WL 2048667, at *2 (W.D. Va. July 11, 2007) ("Virginia's security classification system does not create any federally protected liberty interest in being housed in a particular prison."). In response, Agee simply repeats his assertions that the ICA's recommendation is tainted by perceived procedural errors that Agee believes violated VDOC policies and procedures governing interstate prison transfers, and that Defendants' purported "failure to adhere to these policies violated the Due Process Clause and created a liberty interest." (*See* dkt. 41, at 1). He does not point to any evidence in the record that might create a genuine dispute of material fact over those issues.

Accordingly, Defendants Adams, Collins, and Stanley are entitled to judgment as a matter of law in their favor. Fed. R. Civ. P. 56(a).

3. **Official Capacity Claims**

To the extent Agee seeks compensatory and punitive damages against Defendants in their official capacities as VDOC personnel, such claims are not cognizable under 42 U.S.C. § 1983.

Further, although Agee seeks equitable relief against Defendants in their official capacities, all of his substantive constitutional claims fail on the merits—he does not allege any other basis upon which relief could be granted under 42 U.S.C. § 1983. Accordingly, I will grant Defendants' motion for summary judgment with respect to Agee's official capacity claims.

### C. Preliminary Injunction

Finally, Agee filed a motion for preliminary injunction in which he alleges that ROSP's "administration" refuses to return him to protective custody and has held him in administrative segregation for more than a year as "punishment to force [him] to drop" his lawsuit. (Dkt. 43, at 1). He seeks a court order directing unnamed "administrators" to reinstate his protective custody status and to "stop trying to intimidate [him] into dropping" the action. (*Id.*). Agee cannot show he is entitled to this "extraordinary remedy," *Winter*, 555 U.S. at 20, however, because Defendants already established that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law on the merits of *all* Agee's constitutional claims. None of his claims will procced to trial.

### V. Conclusion

Accordingly Defendants' Motion for Summary Judgment (dkt. 38) will be granted, and Plaintiff's Motion for Preliminary Injunction (dkt. 43) will be denied in accordance with the accompanying order.

**ENTER:** This __18th__ day of March, 2019.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE